**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8|28|20

----------------------------------------------------------X

BINTA PHILLIP,

|                          | Plaintiff, | **DECISION AND ORDER** |

                            -against-                    19 Civ. 5459 (PED)

ANDREW M. SAUL,
COMMISSIONER OF SOCIAL SECURITY,

                                          Defendant.[1]

----------------------------------------------------------X

**PAUL E. DAVISON, U.S.M.J.:**

## I.    INTRODUCTION

Plaintiff Binta Phillip ("Plaintiff" or "Claimant") brings this action pursuant to 42 U.S.C.

§ 405(g) challenging the decision of the Commissioner of Social Security ("Defendant" or the

"Commissioner") denying her application for disability insurance benefits and supplemental

security income.  This case is before me for all purposes on the consent of the parties, pursuant to

28 U.S.C. § 636(c). Dkt. 9.  Presently before this Court are the parties' cross-motions for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Dkts.

11 (Plaintiff's motion), 12 (Plaintiff's memorandum of law), 21 (Defendant's cross-motion), and

22 (Defendant's memorandum of law).  For the reasons set forth below, Plaintiff's motion is

**DENIED** and Defendant's motion is **GRANTED**.

## II.   BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security

---

[1] Andrew Saul is now the Commissioner of Social Security and is substituted for the former
Acting Commissioner Nancy A. Berryhill as the defendant in this action, pursuant to rule 25(d)
of the Federal Rules of Civil Procedure.

Administration. Dkt. 10.

### A. Application History

Plaintiff filed for disability insurance benefits and supplemental security income on August 6, 2015 alleging that she had been disabled since June 30, 2015. R. 214-26.  Her claims were administratively denied on or about September 25, 2015. R. 124-31.  On or about October 8, 2015, Plaintiff requested a hearing before an administrative law judge ("ALJ"). R. 135-49.  A hearing was held on October 23, 2017 before ALJ William M. Manico. R. 66-104.  Plaintiff appeared with counsel and testified at the hearing. *Id.*  On June 13, 2018, ALJ Manico issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act ("SSA"). R. 29-46.  On April 19, 2019, the Appeals Council denied Plaintiff's request for review, R. 1-6, and the ALJ's decision became the Commissioner's final decision.  On June 11, 2019, Plaintiff filed the instant complaint. Dkt. 1.

### B. Plaintiff's Medical History

The Court conducted a plenary review of the entire administrative record, Dkt. 10, familiarity with which is presumed.  Thus, I assume knowledge of the facts surrounding plaintiff's medical treatment and do not recite them in detail, except as necessary in the context of the analysis set forth below.

### C. Hearing Testimony

On October 23, 2017, Plaintiff appeared with counsel before ALJ Manico in Falls Church, Virginia. R. 66-104.  The ALJ began the hearing by briefly asking about Plaintiff's past work as a driver for Federal Express before inquiring as to the cause of a past hospitalization. R. 68.  Plaintiff was hospitalized due to a heart attack, and she explained that she had chest pains, hot flashes, "passed out for a little while," a lot of back pain, and her "whole left side got numb."

R. 68-69.  Plaintiff also responded that she had one stent inserted as a result of her heart attack.
R. 69.  Plaintiff testified that she was not a smoker but had some bad eating habits. *Id.*
Additionally, Plaintiff averred that she suffered from high blood pressure and had her left kidney
removed due to a "three pound tumor that was benign cancer;" the removal of her kidney helped
lower her blood pressure to a normal level. R. 70, 71.  Plaintiff further testified that after having
the stent inserted, she "ha[d]n't had no major issues.  Chest pain here and there, but it's not
nothing that they take seriously." R. 70.

Plaintiff next testified that after her heart attack she was no longer able lift "a maximum
of 75 pounds" as required by her Federal Express job. R. 68, 71.  Plaintiff also explained that she
began to develop issues in her cervical spine after the heart attack. R. 71-72.  Plaintiff's "left side
was hurting a whole lot, like my back, my leg, my arm, my neck," and her doctors "believe I had
symptoms of a stroke that probably damaged a nerve somewhere cause my left side did get fully
numb." R. 72.  Plaintiff's condition continued to "g[et] worse," and she went to physical therapy
for her neck, back, leg, and arms. *Id.*  Plaintiff stated that her cardiologist recommended against
surgery "because of the fact that I'm on blood thinners and a whole bunch of other medication."
*Id.*

The ALJ next asked Plaintiff about her diagnosis of Sjogren's syndrome and when the
symptoms began.  Plaintiff responded that at "first we thought it was just the dry mouth and dry
eyes from the medication, and I did a biopsy back in 2016 of July and it came out positive for the
Sjogren, where it affects your joints and like I get the joint pains from it . . . . I get the dry
mouth, dry eyes and I also get like joint pains." R. 73.

3

Plaintiff next testified that she was taking Cymbalta for depression and anxiety, Topamax for bipolar disorder, and Meclizine for Meniere's syndrome. R. 73-74. Plaintiff clarified that she had not actually been diagnosed as bipolar but rather with a mood disorder. R. 74.

The ALJ then discussed with Plaintiff the Medical Source Statement of Plaintiff's rheumatologist, Dr. Nazia Hussain, and expressed skepticism as to Dr. Hussain's findings related to Plaintiff's tolerance for noise. R. 74-75. Plaintiff testified that "[a]t some point, I can tolerate noise in an office and I can also tolerate – tolerate noise outside. Some noise do affect me, like it kind of makes my vertigo act up." R. 75. Plaintiff took an Uber, not the subway, to the hearing and further explained that traffic, if "[i]t's loud enough, it can trigger me off. A lot of different things trigger off my vertigo," including "loud sirens and stuff." 75-76. However, Plaintiff testified that she had never fallen down on the street as a result of loud traffic noises. R. 76. Additionally, Plaintiff testified that she was not present when Dr. Hussain completed his Medical Source Statement. R. 75.

When the ALJ asked if Plaintiff had any respiratory problems, she responded, "Not major – I do get shortness of breath." R. 76. Plaintiff's counsel agreed that she did not have any respiratory diagnoses, but "[s]he does have shortness of breath, of which the restrictions in terms of the dust and fumes, Your Honor." R. 76-77. Plaintiff added that odors, dust, and perfume, among other things, "usually sometimes just affect my allergies and stuff, I start sniffing and my chest gets congested." R. 77.

The ALJ then turned to Plaintiff's complaints of neck problems, and Plaintiff testified that "[t]he neck pain runs from like my neck down to my arm, it give me like tingly pins and needle numb feeling . . . like it gets stiff and it's hard for me to move my neck and rotate my

arms like stretch it out, down to my fingers, I get pins and needle feeling and numbness." R. 77.

Plaintiff averred that sitting too long, "like a two hour max," could trigger these issues. *Id.*

Plaintiff next testified that the heaviest thing she could lift was a gallon of milk. R. 78.

She also testified that she could partially kneel or bend at the waist to approximately 90 degrees

due to her lower back pain. *Id.* Plaintiff was not sure if she would be able to knee or crawl or get

down on her knees but imagined she could not because of the pain and stiffness "even just

bending" or trying to sit causes in her back and legs. R. 79-80. Additionally, Plaintiff asserted

that she could squat to seat level. Plaintiff averred that she was able to extend and reach with her

arms, but "I the get stiff feeling and it do hurts and my bones and stuff do crack," and that she

could use her fingers and hands normally "for a period of time" until, for example, she had been

"writing for a period of time." R. 81 "[I]t would start hurting – like I start feeling the pain go up

my arm to like the elbow, then the shoulder, to my neck or it starts from my neck to shoulder,

elbow, wrists, fingers." *Id.* Plaintiff believed that her herniated disc and arthritis in her neck and

cervical spine caused this pain. R. 82. Plaintiff also stated that she took Lyrica for ulnar

neuropathy in both her elbows, which helped "sometimes." R. 82.

The ALJ then turned to Plaintiff's living situation, and Plaintiff testified that she lived in

an apartment with her two kids, ages 14 and 9. R. 83. When asked who does the cooking and

cleaning, Plaintiff answered that "[w]e do a lot of take out now . . . . The immediate cooking is

like putting something in the toaster and a microwave . . . . My kids kind of help with the

cleaning and my mom usually comes over and helps straighten up for me." *Id.* Plaintiff also

testified that during the day, if she did not have any appointments, she was "just usually home

sleep." *Id.*

Additionally, Plaintiff averred that her concentration was not great as she "los[t] focus real fast." *Id.* Plaintiff also attested that she did not really get along well with others, and this issue began in 2015 after her heart attack. R. 84-85. Plaintiff explained that she did not include this in her application for disability because "[she] probably didn't even think about that part." R. 84. Plaintiff further testified that she "just [got] really irritated with things real fast. It could be the simplest thing. If they say something to me that I don't agree with, I just get irritated and I would get into a conflict." *Id.* Plaintiff next responded that if she did not have any physical issues, "[d]ealing with other people probably wouldn't have been that major to me." *Id.*

On direct exam by her attorney, Plaintiff testified that she had difficulties at times getting along with people at her treating facilities and at her attorney's office. R. 85-86 Plaintiff's counsel asserted that Plaintiff "sometimes is like she is today and sometimes she's a completely different person. So, sometimes she's – we're able to communicate with her efficiently and sometimes she calls and just is – attacks people, is very aggressive, is very – I mean, I don't want to use strong strong words, but she's very very difficult to communicate with at times. So, it's almost like she fluctuates between two very different personalities." R. 86.

As to her alleged difficulties completing tasks, Plaintiff asserted that, for example, she could walk into the kitchen looking for a bottle of water and forget the reason she was there, "[l]ike I just lose my train of thought – start something and don't finish." R. 87. Plaintiff also testified that she had difficulties following instructions and would "get disoriented or I feel like my way is better than the way that it was given to me." *Id.* When Plaintiff's counsel asked her what activities, if performed for a prolonged period of time, would increase her hand or neck pain, Plaintiff responded, "If I'm sitting, like driving for a period of time, my neck and lower back and legs start hurting," and "[i]f I'm sweeping, using the broom, it starts hurting, my neck,

my arm will start hurting," or "[c]ombing my daughter's hair, it will hurt . . . my arm will start

hurting." R. 87-88.  Plaintiff also responded that she had "a little" difficulty getting dressed, for

example, when buttoning clothing "my hands, my fingers and stuff starts feeling like they're

numb, tingling feeling." R. 89.  Plaintiff averred that she was not able to do her own hair because

"[h]olding my hand up for a period of time it starts hurting.  My shoulders, my arm, my neck

start hurting." *Id.*

   In order to ease her pain, other than taking medications, Plaintiff testified that she slept a

lot, tried to meditate, "usually sometimes sit and try to just massage, rub, different Icy Hot,"

elevated her leg and arm, and used a neck pillow. R. 90.  Plaintiff claimed that she elevated her

leg 75% of the day. *Id.*

   Plaintiff next testified that her medications caused certain side effects, including

drowsiness, nausea, dry mouth, and upset stomach. *Id.*  Plaintiff explained that she would "sleep

for like two to three hours and then I'm up for like an hour or two and then I go back to sleep.

Usually when I take my medicine . . . in the morning, I'm sleep for about a good three hours, just

to get over the funny feeling from the medication." R. 90.  Plaintiff added that she took "a good

four naps a day," each three to four hours long. R. 91.

   When asked again about cleaning, Plaintiff explained that she needed her mother's help

because she could not take the smell of some cleaning products and "bending back and forth"

bothered her back. Id.  Plaintiff added that the smell of the cleaning products bothered her

because of her allergies. R. 91-92.  As to grocery shopping, Plaintiff "usually go[es] with my

kids so they can help pick the stuff off the shelves to put it in the cart and we usually get it

delivered back up to the house." R. 92.  Plaintiff also "usually" used "pick up and drop off" for

laundry.  R. 92.  Plaintiff also explained that her mother and father were helping her take care of

her children because of her health, and her children were "with my parents from Monday to Friday, when they get dropped off on Monday, they don't come back home until Friday." R. 92-93. Plaintiff added that her mental health also affected her ability to care for her children. R. 93.

Subsequently, the ALJ again questioned Plaintiff about her job at Federal Express. Plaintiff responded that she worked there for four years before her heart attack, her performance was "good," and she got along with her coworkers at Federal Express. R. 94. At the time of the hearing, however, she testified that she could hardly be around people at all. Next, the ALJ asked Plaintiff whether her rheumatologist and heart doctor asked her any questions prior to completing their medical source statements to which Plaintiff responded that they had not. R. 95. When asked if her heart condition caused her any difficulty sitting down, she answered, "The most I can think about is my breathing with that . . . . Sometimes I do just get like a shortness of breath. If I'm – if I go to – sit down too fast or I stand up to [sic] fast, I get the shortness of breath." *Id.*

The ALJ then called the Vocational Expert ("VE") and provided him with the following hypothetical:

> Assume a hypothetical claimant that's a younger person, a high school graduate. Assume this person retains the RFC to perform sedentary work as defined in the regulations, but with the following exceptions. Claimant may only occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl. Claimant may never climb ladders, ropes or scaffolds. When the claimant stoops or bends at the waist, this is limited to approximately 90 degrees, which would be like bending over half way . . . . [C]laimant may only frequently reach, handle, finger or feel. Claimant may frequently operate foot controls. Claimant should avoid concentrated exposure to extremes of heat, cold, humidity, vibrations, odors, dust, gases, fumes, etc. . . . . [C]laimant should not work in environments which expose her to sounds of jackhammers or other very loud noises on a regular basis . . . . Claimant retains the mental RFC to perform unskilled work, rate interactions with others as limited to occasional and which would allow her a regular work break approximately every two hours.

R. 96-97.

The VE concluded that Plaintiff could not perform her past relevant work, but three sedentary, unskilled jobs that Plaintiff could perform existed in significant number in the national economy: (1) eye wear polisher, DOT code 713.684-038 with approximately 15,000 jobs nationally; (2) toy stuffer, DOT code 731.685-014 with approximately 39,000 jobs nationally; and (3) final assembler, DOT code 713.687-018 with approximately 46,000 jobs nationally. R. 98.

For a second hypothetical, the ALJ removed the mental restrictions, and the VE responded that Plaintiff would be able to return to her past job of receptionist in that scenario. R. 98. Lastly, the ALJ asked the VE if his testimony was consistent with the DOT and the SCO, and the VE answered, "Yes, Your Honor." R. 99.

Plaintiff's attorney then cross-examined the VE, and asked the VE whether, considering the ALJ's first hypothetical along with the following four hypotheticals separately, the Plaintiff could still perform the three jobs listed by the VE: (1) the individual could only occasionally reach, handle, and finger bilaterally; (2) the individual could only sit for four hours total in an eight our day and stand for three hours; (3) the individual would be off task 20% of the time; or (4) the individual would be absent five times a month. R. 99-100. The VE answered all four hypotheticals posed by Plaintiff's counsel in the negative. *Id.*

## III.   THE ALJ'S DECISION

The ALJ issued his decision on June 13, 2018 following the standard five-step inquiry used for determining disability. R. 29-46. In the first step of the inquiry, the ALJ determined that Plaintiff had not performed substantial gainful activity since June 30, 2015, the alleged onset date. R. 32.

At step two, the ALJ found that several of Plaintiff's medical issues—degenerative disc disease of the lumbar and cervical spine, coronary artery disease, status-post stent, vertigo, Raynaud's syndrome, Sicca syndrome, Sjogren's syndrome, moderate left elbow ulnar neuropathy/mild right elbow ulnar neuropathy, and affective disorder(s)/anxiety disorder(s)—rose to the level of "severe." R. 32.  The ALJ also found that Plaintiff's diagnoses of tension type headaches, hypertension, and hearing loss were non-severe impairments. R. 32.

At step three, the ALJ decided that Plaintiff's impairments, or combination of impairments, did not meet or medically equal the "Appendix 1" impairments. R. 32-33.  The ALJ explicitly considered listings 1.02, 1.04, 4.02, 4.04, 9.00, and 12.04. R. 32-34.

The ALJ determined that Plaintiff's impairments did not meet or equal listings 1.02 (major joint dysfunction), 1.04 (disorders of the spine), 4.02 (chronic heart failure), 4.04 (ischemic heart disease), or 9.00 (endocrine disorders) because "a review of the medical evidence in its entirety shows that the claimant's impairment does not meet or equal the level of severity set forth in any of the listed impairments.  Additionally, no treating or examining physician(s) has indicated findings that would satisfy the severity requirements of any listed impairment." R. 33.

The ALJ then discussed listings 12.04 and 12.06 in more detail.  Listings 12.04 and 12.06 are met if the claimant can establish either the existence of depressive, bipolar, or related disorders or anxiety, panic, or obsessive-compulsive disorders, respectively, *and* satisfy the requirements in either paragraph B *or* C, both of which are identical in the corresponding listings, as discussed *infra*.  The ALJ found that the paragraph B criteria were not satisfied "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation," reasoning that the records showed that Plaintiff had mild to moderate

limitations in the four areas of mental functioning, discussed *infra*. R. 33-34.  The ALJ further concluded that the record failed to establish paragraph C criteria as Plaintiff "has not presented evidence of a mental disorder that has lasted for two years; requires medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes symptoms and signs of his mental disorder; and evidence that the claimant would have minimal capacity to adapt to changes in her environment or to demands that are not already part of the claimant's daily life ." R. 34.

Between steps three and four, the ALJ assessed Plaintiff's residual functional capacity ("RFC"). R. 34-44.  The ALJ concluded that Plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except: The claimant may only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. The claimant may never climb ladders, ropes or scaffolds, and stooping is limited to approximately 90 degrees. The claimant may only frequently reach[,] handle, finger, or feel.  The claimant may frequently operate foot controls.  The claimant should avoid concentrated exposure to extremes of heat, cold, humidity, vibration, odors, dusts, gases, fumes[,] etc.  The claimant should avoid exposure to hazards.  The claimant retains the mental residual functional capacity to perform unskilled work where interactions with others are limited to only occasional, and which would allow her a regular work break approximately every two hours." R. 34-35 (emphasis omitted).  In reaching this conclusion, the ALJ considered Plaintiff's symptoms, the extent to which her symptoms were consistent with objective medical evidence and other evidence, and opinion evidence.

In assessing Plaintiff's alleged symptoms, the ALJ ultimately determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and

limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 41.

The ALJ first acknowledged Plaintiff's myocardial infarction, diagnosis of heart failure, and stent placement prior to the onset date of her alleged disability. However, the ALJ further noted that in an August 2015 report from Mount Sinai, R. 397-401, Plaintiff reported that her cardiac issues were stable, that she had no chest pain or angina, and that she denied symptoms of dyspnea, palpitations, or syncope. The ALJ also noted that Plaintiff reported that she continued to experience vertigo and dizziness and complained of left upper extremity pain. R. 35. The ALJ referenced the consultative internal medicine exam of Dr. Roshan Kothandaram, dated September 3, 2015, R. 402-406, in which Dr. Kothandaram noted that, during an exam, Plaintiff had a positive straight leg raising test with her left at 45 degrees and right at 70 degrees, but Plaintiff was in no acute distress, she had no abnormalities in her ability to walk or squat, her heart had normal functioning, and she had full range of motion in her upper and lower extremities. R. 36. Plaintiff was diagnosed with congestive heart failure, subendocardial myocardial infarction, hypertension, vertigo, Meniere's disease, sensorineural hearing loss, benign renal tumor, human papillomavirus, and back pain. *Id.* Lastly, the ALJ observed that Dr. Kothandaram opined that Plaintiff had moderate limitations with walking, lifting, pushing, pulling and carrying and that she should avoid activities involving mild to moderate exertion given her cardiac condition. *Id.*

The ALJ next addressed Plaintiff's continued treatment for vertigo, discussing occupational and physical therapy progress notes indicating that although Plaintiff complained of nausea, dizziness, and tinnitus, Plaintiff had no difficulty walking with her eyes open or going up or down stairs, and her nausea and dizziness symptoms had decreased over time. R. 36. Indeed,

the ALJ cited to notes from January 2016 in which it was reported that Plaintiff was feeling better, experiencing dizziness less often, and was able to perform her ADLs with less symptoms. *Id.* (citing R. 434).

The ALJ also discussed stable findings related to Plaintiff's myocardial infarction from February 2016. R. 36-37.  In the report, Plaintiff had complained of chest pain and mild weakness and numbness on her left side. R. 37 (citing R. 514-17).  The exam revealed discomfort in Plaintiff's neck but there was no evidence of spinal tenderness.  Additionally, Plaintiff had normal strength in her bilateral upper and lower extremities, and a normal gait. The staff recommended physical therapy for her neck pain and, at a follow up appointment in June 2016, Plaintiff reported that the physical therapy helped and she was "feeling a little better." R. 37 (citing R. 530).  Moreover, Plaintiff had similar findings on exam at the June appointment, and Plaintiff later reported that adjustments made to her medications were "somewhat helpful." *Id.* (citing 533).

The ALJ next referenced Plaintiff diagnosis of Sjogren's syndrome following her report of dry mouth and a lip biopsy. R. 37; *see also* R. 602.

Turning briefly to Plaintiff's treatment records for her mental impairments, the ALJ discussed notes from October 2016 in which Plaintiff complained of anxiety and depression. R. 37.  Plaintiff reported poor sleep and increased periods of anger and isolating behavior; however, medical staff noted that Plaintiff was cooperative and calm, her thought process were linear, and that she exhibited no abnormal thought content or perceptions.  Plaintiff was diagnosed with adjustment disorder with mixed depression and anxiety. R. 37 (citing R. 588-93).  The ALJ also noted a progress note from a couple weeks later in October observing that Plaintiff's condition was stable within established limits. R. 37 (citing R. 568).

The ALJ also cited treatment notes indicating that Plaintiff's physical impairments remained stable and controlled with her medications. R. 37 (citing R. 557).   The ALJ acknowledged Plaintiff's continued complaints of neck and back pain in notes from Dr. Kamara Aseme from April 2017; however, at Plaintiff's annual physical with Dr. Aseme, Plaintiff had normal range of motion in her neck and her heart had a normal rate, rhythm, and sound. R. 37 (citing R. 737).   Plaintiff also had no respiratory distress. *Id.*

With respect to Plaintiff physical ailments, the ALJ relied on a July 2017 MRI of Plaintiff's cervical spine showing mild disc bulging and herniations with otherwise unremarkable findings (R. 820-21), an Electromyography report ("EMG") revealing moderate focal ulnar neuropathy in Plaintiff's left elbow and mild focal ulnar neuropathy in her right elbow with otherwise unremarkable findings (R. 685), and an August 2017 MRI of Plaintiff's thoracic and lumbar spine following complaints of radiating back pain, numbness, and weakness (R. 822, 936). R. 38.   The findings related to Plaintiff's thoracic spine were unremarkable (R. 822), and those of her lumbar spine showed signs of disc bulges (R. 936).

The ALJ next discussed notes from Plaintiff's neurologist, Dr. Migdana Kepecs, from August 2017 indicating that while Plaintiff continued to complain of left-sided neck, shoulder, elbow, wrist, and knee pain, and that her gait was antalgic due to the left leg pain, she had full strength in her upper and lower extremities. R. 38 (citing R. 930, 932).   The ALJ also acknowledged a letter written by Dr. Kepecs recommending that Plaintiff refrain from any heavy lifting. R. 38 (citing R. 1023).

In further support of his decision related to Plaintiff's cardiac condition, the ALJ discussed the Medical Source Statement of Dr. Robert Leber, Plaintiff's cardiologist. In September 2017, Dr. Leber reported that although Plaintiff reported dizziness, she was stable

14

overall. R. 38 (citing R. 944-47).  Dr. Leber, in his October 2017 Medical Source Statement, discussed *infra*, found that, *inter alia*, Plaintiff could frequently use her feet for the operation of foot controls, frequently climb ramps and stairs, and occasionally climb ladders, balance, stoop, or kneel. R. 38 (citing R. 1016-22).

In addition to Dr. Leber's report, the ALJ discussed October 2017 Medical Source Statements completed by Plaintiff's psychiatrist, Dr. Dillon Hayes; Plaintiff's rheumatologist, Dr. Hussain; and Plaintiff's internist, Dr. Aseme.  Dr. Hayes reported that Plaintiff had a GAF score of 45, indicating a serious functional impairment, that Plaintiff was unable to work for 20% of the workday, that she had moderate to marked functional limitations in her ability to sustain concentration and persistence and ability to interact with others; moderate limitations in adaptation; and no limitations in understanding and memory functioning. R. 39 (citing 1026-29). Dr. Hussain, as discussed *infra*, noted significant limitations in Plaintiff's abilities to lift and carry weight; sit, walk, or stand for extended periods of time; use her hands and feet, and perform postural activities. R. 39 (citing 1030-35).  Finally, Dr. Aseme's Medical Source Statement contained identical findings to those of Dr. Hussain. R. 39 (citing 1064-69).

After determining that the above medical evidence "[did] not demonstrate that [Plaintiff's] limitations [were] so severe as to render her disabled," the ALJ turned to an examination of Plaintiff's statements in the record and her hearing testimony and considered "the severity of [her] symptoms, pain level, and the extent to which [her] symptoms [were] consistent with evidence as a whole." R. 39-41.

As to Plaintiff's hearing testimony, the ALJ acknowledged Plaintiff's testimony that her heart condition caused significant limitations, such as shortness of breath when rising from a seated position, but again cited to her treatment records showing normal findings, including

evidence that her medication had helped with her symptoms of vertigo. R. 39-40. The ALJ also noted Plaintiff's testimony that her allergies were the cause of her environmental restrictions and that her lower back pain caused her limitations related to postural activities and concluded that there was "little [evidence] to corroborate the severity she and some of her physician [sic] indicated," noting evidence in the record demonstrating no more than moderate joint and back pain. R. 40. As discussed *infra*, the ALJ also specifically acknowledged Plaintiff's testimony that "her arms only stiffen when extended and that she experiences some numbness in her fingers and thumbs after use." *Id.* The ALJ added that Plaintiff testified that her physicians failed to interview her about the severity of her hand and finger numbness, "cast[ing] doubt on their accuracy." *Id.* The ALJ also cited Plaintiff's testimony that she could squat to seat level and had never fallen or lost balance due to headaches caused by loud noises. *Id.*

As to Plaintiff's mental impairments, the ALJ found that while Plaintiff reported having these impairments since her 2015 heart attack and that she testified that "she gets irritated with others," Plaintiff's mental status evaluations had normal findings and progress notes showed that "she appeared to interact well with others, especially in group therapy." *Id.* The ALJ also pointed to Plaintiff's statements in her function report that she lived with and cared for minors, had no difficulty managing her personal care, performed some household chores, used public transportation, and enjoyed watching television and reading. *Id.*

The ALJ next discussed the opinion evidence in the record and assigned weights to the opinions of Dr. Kothandaram, Dr. Leber, Dr. Kepecs, Dr. Hayes, Dr. Hussain, Dr. Aseme, and the state agency's determination. R. 41-44. The ALJ accorded great weight to opinion of Dr. Kothandaram's September 2015 consultative internal medical exam, discussed above, noting the consistency of his findings with the record as a whole and Dr. Kothandaram's moderate findings

and reports of full strength in Plaintiff's upper and lower extremities. R. 41.  The ALJ assigned

partial and/or limited weight to the opinions of Dr. Leber, noting that although Dr. Leber had an

extensive treating relationship with Plaintiff, Plaintiff testified that Dr. Leber did not question her

prior to completing the form and that Dr. Leber's treatment notes were inconsistent with his

medical source statement. R. 41-42.  Next, the ALJ accorded partial weight to the opinion of Dr.

Kepecs, observing that Dr. Kepecs's opinion "[was] somewhat vague in nature." R. 42.  The ALJ

assigned little weight to the opinions of Dr. Hayes as the ALJ opined that Dr. Hayes's notes, and

Plaintiff's own testimony, did not support marked finings in any area of mental functioning. R.

42-43.  The ALJ also accorded little weight to the opinions of both Dr. Aseme and Dr. Hussain

noting their opinions' "striking [ ] similar[ity]." R. 43-44.  The ALJ further observed that Dr.

Aseme appeared to have a limited treating relationship with Plaintiff, both doctors appeared to

have failed to question Plaintiff prior to completing the medical source statements, and their own

treatment notes and the record as a whole were inconsistent with their opinions on the forms. *Id.*

Finally, the ALJ accorded no weight to the state agency's determination regarding Plaintiff

physical limitations as the opinion was from a "nonmedical single decision maker." R. 44.

 At step four, the ALJ considered whether the claimant would be able to perform any past

relevant work and concluded that she could not. R. 44.

 At step five, the ALJ concluded that "[b]ased on the testimony of the vocational expert, . .

. considering the claimant's age, education, work experience, and [RFC], the claimant is capable

of making a successful adjustment to other work that exists in significant numbers in the national

economy." R. 45-46.

 Following these conclusions, the ALJ reached the end of the five-step process,

determined that Plaintiff was not disabled, and denied her application for benefits. R. 46.

## IV.    LEGAL STANDARD

### A.    Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (*per curiam*).

The substantial evidence standard is "even more" deferential than the 'clearly erroneous' standard. *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner

"for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

**B.      Statutory Disability**

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  In addition, a person is eligible for disability benefits under the SSA only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *Id.* § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); *see* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).  The claimant bears the burden of proof as to the first four steps of the process. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step. *See id.*  At the fifth step, the Commissioner must prove that the claimant can obtain substantial gainful employment in the national economy. *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## V.    ASSESSING THE ALJ'S FINDINGS

Plaintiff challenges the ALJ's determination on five grounds: (1) the ALJ erred in his application of the treating physician rule; (2) substantial evidence does not support the ALJ's conclusions (a) at step three and (b) as to Plaintiff's residual functional capacity; (3) the VE's testimony was erroneous and inconsistent with the DOT; (4) the ALJ failed to perform the Psychiatric Review Technique described in 20 C.F.R. § 404.1520a; and (5) the ALJ's RFC determination, as is, mandates a finding of disability.  For the reasons discussed below, I find that the ALJ provided good reasons supported by substantial evidence for the weight accorded the opinions of Plaintiff's physicians, his decisions at step three and his RFC analysis were supported by substantial evidence, Plaintiff's argument concerning the VE's testimony is forfeited, and her remaining arguments are without merit.

### A.  Treating Physician Rule

Plaintiff argues that the ALJ erred by according Dr. Hussain's opinions limited weight, rather than "great, if not controlling weight." Dkt. 12 at 20.  Defendant contends that the ALJ's

decision complied with the treating physician rule and was supported by substantial evidence due to the "lack of support and inconsistency with other substantial evidence" of Dr. Hussain's opinions. Dkt. 22 at 31.

When considering the record evidence, the ALJ must give deference to the opinions of a claimant's treating physician. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 416.927(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ should consider the following factors to determine the amount of weight the opinion should be given: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(2)-(6); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.") (citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (*per curiam*)). As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran*, 362 F.3d at 32-33.

Dr. Hussain, Plaintiff's rheumatologist, concluded in his Medical Source Statement that

Plaintiff could never lift or carry up to ten pounds, reasoning that "patient had joint pains, cervical spine arthritis and a history of heart disease." R. 1030.  Dr. Hussain also opined that Plaintiff, either consecutively or total in an eight-hour workday, could sit for a maximum of four hours, stand for one hour, and walk for one hour. R. 1031.  Additionally, Dr. Hussain observed that Plaintiff could occasionally reach, handle, finger, and feel, but never push or pull with her hands bilaterally; and Plaintiff could occasionally operate foot controls. R. 1032.  Dr. Hussain next concluded that Plaintiff could never climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, or crawl. R. 1033.  Finally, Dr. Hussain opined that Plaintiff could never tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, dust, odors, fumes, pulmonary irritants, or extreme cold and heat; she could occasionally tolerate humidity and wetness and vibrations; and she could tolerate no more than "[m]oderate ([o]ffice)" noise. R. 1034.

The ALJ accorded "little weight" to Dr. Hussain's opinion reasoning that the "rather extreme functional limitations" contained in his Medical Source Statement were unsupported by the evidence as a whole, his own notes, "or in some cases common sense." R. 43-44. Specifically, the ALJ noted that although Dr. Hussain's determination that Plaintiff could not lift up to 10 pounds or perform other postural activities was "likely related to the claimant's complaints of back pain," Plaintiff's "lumber spine MRI showed no more than mild findings," and "one would expect to see much more than unremarkable objective scans in the record, as well as reference to these restrictions in her medical notes." R. 44.  Additionally, the ALJ concluded that there was little to no support in the record for Dr. Hussain's determinations that Plaintiff could only tolerate office noise, was incapable of climbing stairs, balancing, stooping, kneeling, or crouching, or that she should avoid driving and pulmonary irritants.  "Regarding her

complete and total bar to pulmonary irritants, including dust," the ALJ noted that Plaintiff

"testified in an ordinary hearing room and appeared without a protective mask, and there is

nothing in the evidence to suggest that the claimant must reside in a hermetically sealed chamber

or wear a protective mask." *Id.*  Moreover, the ALJ observed that the records showed that

Plaintiff's respiratory functions were generally normal. *Id.*  Finally, the ALJ remarked that

Plaintiff "testified that Dr. Hussain never questioned her prior to completing the form, which

gives a strong inference that Dr. Hussain's opinion is based on speculation at best, or oriented

towards results at worst." *Id.*

Plaintiff first saw Dr. Hussain on April 4, 2016. R. 877.  After performing a physical

exam, Dr. Hussain observed minimal tenderness in the joints of Plaintiff's left hand, minimal

pain in her left hip with extension and rotation, full strength in her extremities, and strong neck

flexors. R. 878.  Plaintiff was assessed with joint pain. *Id.*  Although still diagnosed with joint

pain, on April 11, 2016, Dr. Hussain documented normal findings other than pain in Plaintiff's

left knee with flexion. R. 874-75.  On July 11, 2016, Dr. Hussain noted that Plaintiff had bilateral

hip pain with extension and rotations but full range of motion and full motor strength in her

extremities. R. 870.  On October 31, 2016, Dr. Hussain reported the same findings but added an

assessment of pain in her bilateral shoulders with abduction. R. 866.  On January 31, 2017, Dr.

Hussain's findings were again the same but with the inclusion of left elbow tenderness. R. 860.

From April through July 2017, Dr. Hussain noted normal findings on Plaintiff's physical exams

with the only exception being an assessment of toe tenderness in June. R. 839-40, 842, 846, 849-

50, 854-60.

On July 7, 2017, an MRI of Plaintiff's cervical spine revealed a disc bulge at C3-C4, disc

herniation at C4-C5, disc bulge and herniation at C5-C6, and disc herniation at C6-C7, but

showed no significant cord compression or foraminal narrowing. R. 820-21; *see also* R. 685.  On August 10, 2017, an MRI of Plaintiff's thoracic spine was normal. R. 822.  On August 28, 2017, an MRI of Plaintiff's lumbar spine revealed posterior central disc bulges at L4/5 and L5/S1 but without any neural foraminal narrowing. R. 936.

As for Plaintiff's cardiac condition, Dr. Leber consistently found, and Plaintiff reported, that it was stable. R. 400, 557.  Dr. Kepecs observed that although Plaintiff had some decreased sensation, she had full strength in all her extremities. R. 514-19, 523, 523, 530.  Dr. Aseme noted that Plaintiff had full range of motion in her neck and unremarkable cardiovascular findings. R. 737.  Dr. Kothandaram, in his internal medicine consultative examination, observed that Plaintiff had normal heart functioning, less than full flexion and extension in her lumbar spine, a positive straight leg raising test, and full range of motion in her cervical spine and the remainder of her joints, and concluded that Plaintiff "ha[d] moderate limitations to walking, lifting, pushing, pulling, and carrying . . . [and] should avoid activities involving mild to moderate exertion related to cardiac condition." R. 404-06.

In Plaintiff's function report, she reported that her daily activities included caring for her children without assistance; that due to her condition, she could no longer "run, drive, walk fast[,] [or] lift up to 75 lbs;" that she could only sleep for two to three hours before being awake for another two to three hours because of her medication and anxiety; that she had no problems with personal care; that she prepared food and all meals daily; that she cleaned her household, ironed, and washed the dishes, though she needed help with laundry, household repairs, mopping, and food shopping; that she was able to ride in a car and use public transportation but could not go out alone due to dizziness; that she could not drive due to vertigo; that she shops for clothing for her family and sometimes food; that due to her illness she was no longer able to do

any physical sports or activities; that she could walk a mile before stopping to rest and would

need to rest for 10 minutes before continuing; and that her pain made her "unable to attend to

[her] kids." R. 265-71.  Additionally, at her hearing, Plaintiff testified that since she had a stent

put in, she had not had any major cardiac issues, R. 70; that she could "at some point" tolerate

noise outside, though some loud noises caused her vertigo to act up, R. 75-76; that she had no

major respiratory problems, and odors and dust "usually sometimes just affects my allergies and

stuff, I start sniffing and my chest gets congested," R. 76-77; that she could bend over

approximately 90 degrees, R. 78; that she could squat to "sitting level," R. 80; that she could

extend and reach with her arms though they would get stiff and painful; and that she could use

her fingers and hands normally "for a period of time" until her fingers get numb and tighten, for

example, after writing for a period of time, R. 81.  On the other hand, she also testified that rather

than cooking, she was ordering a lot of take out for herself and her children at the time of the

hearing, R. 83; that her cooking involved putting food in the toaster or microwave; that her kids

and her mother helped with the cleaning; that if she sits for an extended period of time her lower

back, legs, and neck began to hurt, R. 87-88; that sweeping and combing her daughter's hair

caused her upper extremities to hurt, R. 88; that she had "a little" difficulty getting dressed, for

example, buttoning caused numbness in her hands and fingers, R. 89; that she was unable to do

her own hair, *id.*; that she slept a lot, R. 90; that she kept her legs elevated for 75% of the day;

that her kids helped her with grocery shopping, R. 92; that she usually used a drop off laundry

service, *id.*; and that her mother and father helped with taking care of her children, indeed, the

kids stayed with her parents from Monday to Friday every week, R. 93.

Other than the evidence discussed above, Plaintiff points to the length, nature, and extent

of Dr. Hussain's treatment relationship with Plaintiff; a July 25, 2017 electromyography of

25

Plaintiff's elbows showing moderate focal ulnar neuropathy in her left elbow and mild focal ulnar neuropathy in her right elbow, R. 685; several similarities between Dr. Hussain's and Dr. Aseme's findings; an October 2, 2017 examination report by Dr. Kepecs noting pain, stiffness, and some numbness in Plaintiff's left leg, left arm, and fingers, R. 1012; Dr. Leber's opinion concerning Plaintiff's environmental limitations, R. 1020; an October 15, 2015 vestibular physical therapy evaluation indicating severe dizziness and that Plaintiff was a moderate fall risk, R. 412; and Plaintiff's testimony that she had shortness of breath, R. 76.

First, the ALJ addressed Dr. Aseme's opinion, noting the "striking[ ] similar[ities]" between the opinions of Dr. Aseme and Dr. Hussain, Dr. Aseme's limited treating relationship with Plaintiff, and the inconsistency of Dr. Aseme's findings with the record as a whole, and accorded Dr. Aseme's opinion little weight. Plaintiff does not contest the ALJ's assessment of Dr. Aseme's opinion or the reasons given for the weight assigned his opinion. And although Dr. Leber opined that Plaintiff could occasionally tolerate dust, odors, fumes, pulmonary irritants, extreme heat, extreme cold, and vibrations, and that she could only tolerate "[m]oderate ([o]ffice)" noise, R. 1012, the ALJ also laid out his reasoning for according Dr. Leber's opinion limited and/or partial weight, R. 41-42, which Plaintiff does not challenge here. Additionally, despite the 2015 finding related to the severity of Plaintiff's dizziness, Dr. Kepecs noted on April 13, 2016, that Plaintiff's dizziness had improved, R. 523, and Plaintiff's own testimony revealed that noise could make her "a little bit dizzy," but she could tolerate some street noise and had never fallen due to noise induced dizziness. R. 75-76. Finally, although Plaintiff replied that she had shortness of breath when asked if she had any respiratory problems, she conceded that her problems were "[n]ot major." R. 76. The evidence cited by Plaintiff fails to negate the "good reasons" given by the ALJ for according Dr. Hussain's opinion little weight.

Accordingly, I find that the ALJ provided good reasons, supported by substantial evidence, for his decision to assign Dr. Hussain's opinion little weight.

## B. Substantial Evidence

### 1. Substantial Evidence Supports the ALJ's Determination that Plaintiff's Impairments, or Combination of Impairments, do not Meet or Medically Equal a Listed Impairment.

Plaintiff contends that the ALJ failed to properly consider listings 12.04, 12.08, and 14.10. Dkt. 12 at 14. Listing 12.04 is met if the claimant can establish, through medical documentation, the existence of depressive or bipolar disorders *and* satisfy the requirements in either paragraph B *or* C:

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

    1. Understand, remember, or apply information (see 12.00E1).

    2. Interact with others (see 12.00E2).

    3. Concentrate, persist, or maintain pace (see 12.00E3).

    4. Adapt or manage oneself (see 12.00E4).

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

    1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

    2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.04.

Listing 12.08 is satisfied if the claimant can establish, through medical documentation, the existence of personality or impulse-control disorders *and* satisfy the requirements of paragraph B, which are identical to the paragraph B requirements listed above for listing 12.04. *Id.* § 12.08.

As discussed above, the ALJ found that the paragraph B criteria were not satisfied "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation," reasoning that the records showed that Plaintiff had mild to moderate limitations in the four areas of mental functioning. R. 33-34. The ALJ further concluded that the record failed to establish paragraph C criteria as Plaintiff "has not presented evidence of a mental disorder that has lasted for two years; requires medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes symptoms and signs of his mental disorder; and evidence that the claimant would have minimal capacity to adapt to changes in her environment or to demands that are not already part of the claimant's daily life ." R. 21.

As to the paragraph B criteria, the ALJ first concluded that the record demonstrated that Plaintiff had moderate limitations in the area of understanding, remembering, or applying information. R. 33. The ALJ acknowledged that Plaintiff reported having issues with her memory and that her reports of difficulty sleeping would also likely contribute to her memory issues, but reasoned that medical records showing that medical staff "generally considered her thought processes to be within normal limits, as they typically described them as linear and conversational" supported his finding in this area. *Id.* Next, the ALJ found that Plaintiff had moderate limitations in interacting with others. *Id.* The ALJ noted that although Plaintiff reported in her function report that she did not feel comfortable being in public or in a group and

28

did not like engaging in social activities, Plaintiff also reported that she travels by riding in a car and using public transportation; she leaves her home to shop for clothing, food, and other items; she spends time on the telephone; and her group therapy notes reveal that Plaintiff attended activities at her children's school. *Id.* As to concentrating, persisting, or maintaining pace, the ALJ concluded that Plaintiff had moderate limitations because Plaintiff reported that she reads and watches television, activities which required a "modicum of concentration;" her medical records supported that Plaintiff "exhibited no abnormalities in her thought content, and staff reported that she had no perception abnormalities;" her insight, judgment, and awareness were considered fair; and staff reported that she was oriented, alert, and attentive. R. 33-34.  Finally, the ALJ found that Plaintiff exhibited a mild limitation in adapting and managing herself due to reports that she managed her activities of daily living with little difficulty, including dressing, grooming, and bathing herself, and although she needed assistance with laundry and repairs, she performed various household chores and cared for her minor children. R. 34.

Plaintiff relies solely on the opinion of Dr. Hayes in his mental residual functional capacity assessment that Plaintiff had moderate to marked limitations in sustained concentration and persistence and in social interaction. R. 12 at 15 (citing R. 1027-28).  Specifically, Dr. Hayes opined that with respect to sustained concentration and persistence, Plaintiff had marked limitations in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with and proximity to others without being distracted by them; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods. R. 1027-28.  Under social interaction, Dr.

Hayes found that Plaintiff had a marked limitation in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. R. 1028.

Substantial evidence in the record supports both the ALJ's conclusion to accord little weight to the opinion of Dr. Hayes, R. 42-43, which Plaintiff does not contest here, and the ALJ's determination that the record evidence reveals only mild to moderate limitations in the paragraph B criteria, R. 33-34. As to Plaintiff's ability to interact with others, the ALJ cited to records indicating that Plaintiff participated in group therapy, even offering assistance to her peers, and that Plaintiff was cooperative and calm with medical staff. R. 40, 43; *see also* R. 1097, 1111-12, 1115, 1118, 1132, 1134, 1156, 1169-70, 1178, 1181, 1186, 1188, 1191, 1195, 1210, 1217, 1220, 1223, 1232, 1236, 1240, 1250-51. The Court notes, however, that although the ALJ asserted that Plaintiff testified at the hearing that she got along well with others, R. 43, Plaintiff actually testified that she did "not really" get along with other people; "sometimes" she did, but it "depends. I just get really irritated with things real fast. It could be the simplest thing. If they say something to me that I don't agree with, I just get irritated and would get into a conflict." R. 83-84. Additionally, Plaintiff asserted that she sometimes had difficulty getting along with people at her treating facilities and at her attorneys' office and "could hardly be around others." R. 85-86, 94. However, the numerous records cited above concerning her calm and cooperative nature with medical staff contradict this assertion. With respect to Plaintiff's ability to concentrate, persist, and maintain pace, the ALJ cited records consistently demonstrating that her thought processes were linear and conversational; that she had no perceptual disturbances; and that she was oriented, alert, and attentive. R. 43; *see also* R. 545, 548, 550, 552, 561, 566, 568, 1088, 1094, 1102, 1105, 1115, 1121, 1129, 1137, 1140, 1145, 1154, 1159-60, 1162, 1167, 1181, 1202, 1204, 1226, 1228, 1243, 1246, 1250-51, 1256, 1258, 1268, 1271, 1276, 1278.

Accordingly, as Plaintiff objects only to the ALJ's determination as to the paragraph B criteria, the ALJ's decision at step three that Plaintiff's severe impairments, or combination of impairments, did not meet or equal listings 12.04 and 12.08 was supported by substantial evidence.

Listing 14.10 is satisfied if the claimant can demonstrate a diagnosis of Sjogren's syndrome[2] with:

A. Involvement of two or more organs/body systems, with:

    1. One of the organs/body systems involved to at least a moderate level of severity; and

    2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

or

B. Repeated manifestations of Sjogren's syndrome, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

    1. Limitation of activities of daily living.

    2. Limitation in maintaining social functioning.

    3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 14.10.

Plaintiff argues that she meets the paragraph B criteria because "there is evidence [in the record] of constitutional symptoms of severe fatigue . . . and malaise," "Plaintiff's ability to

---

[2] "Sjogren's syndrome is an immune-mediated disorder of the exocrine glands. Involvement of the lacrimal and salivary glands is the hallmark feature, resulting in symptoms of dry eyes and dry mouth, and possible complications, such as corneal damage, blepharitis (eyelid inflammation), dysphagia (difficulty in swallowing), dental caries, and the inability to speak for extended periods of time. Involvement of the exocrine glands of the upper airways may result in persistent dry cough." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 14.00D7(i).

sustain concentration, persistence, or pace is markedly limited," "[t]he record also shows a marked limitation in Plaintiff's ability to maintain social functioning," and "[t]he record shows a marked limitation in Plaintiff's ability to perform activities of daily living." Dkt. 12 at 17-18.

Notwithstanding the fact that the ALJ did not specifically address listing 14.10 at step three, for the same reasons discussed above related to the paragraph B criteria for listings 12.04 and 12.08, a finding that the record did not reflect that Plaintiff suffered from marked limitations in social functioning or maintaining concentration, persistence, or pace is supported by substantial evidence in the record.[3] As to activities of daily living, the commissioner will find a "marked" limitation "if [the claimant has] a serious limitation in [her] ability to maintain a household or take public transportation because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, caused by [her] immune system disorder (including manifestations of the disorder) or its treatment, even if [she is] able to perform some self-care activities." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 14.00(I)(6).

Plaintiff argues that because she testified that she travelled to the hearing in an Uber as opposed to public transportation; because she experienced pain and stiffness when reaching with

---

[3] Similar to listings 12.04 and 12.08, the commissioner will find a "marked" limitation in maintaining social functioning if the claimant "ha[s] a serious limitation in social interaction on a sustained basis because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, or a pattern of exacerbation and remission, caused by [her] immune system disorder (including manifestations of the disorder) or its treatment, even if [she is] able to communicate with close friends or relatives," 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 14.00(I)(7), and the commissioner will find "a 'marked' limitation in completing tasks if [the claimant has] a serious limitation in [her] ability to sustain concentration or pace adequate to complete work-related tasks because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, caused by [her] immune system disorder (including manifestations of the disorder) or its treatment, even if [she is] able to do some routine activities of daily living," *id.* § 14.00(I)(8).

her arms, combing her daughter's hair, and sweeping; and based on Dr. Hussain's findings in the Medical Source Statement, she satisfied this criteria.

As discussed *supra*, the ALJ repeatedly cited to Plaintiff's statements and testimony in the record related to her activities of daily living. Indeed, as discussed, Plaintiff asserted in her function report that she was able to care for her children, had no problems with her personal care, could maintain her household though she required assistance with some tasks, and was able to use public transportation. However, as also noted above, she testified at the hearing that her cooking consisted of using the microwave and toaster and she was mostly ordering takeout, her children and mother helped her with cleaning and grocery shopping, and her mother and father took care of her children from Monday through Friday. In any event, the record does not reflect a connection between her difficulties with these activities and her diagnosis of Sjogren's syndrome. Based on a review of the records, the only symptoms listed that are associated with Plaintiff's diagnosis are dry mouth and joint pain. R. 533, 596, 600, 729. Indeed, several of the records cited by Plaintiff as demonstrative of Plaintiff's Sjogren's diagnosis and treatment indicate that she was not suffering from fatigue. R. 945, 949, 953, 961. Although the records reveal that, at other times, Plaintiff was suffering from fatigue, the records do not connect the fatigue to Sjogren's syndrome and there is no indication in the record that her fatigue was severe, as required by the regulations. R. 839, 845, 849, 854, 859, 865. As to malaise, Plaintiff's citations make no mention of malaise and there appears to be no record evidence supporting that Plaintiff has suffered from malaise. R. 948, 964, 967, 970. Plaintiff also cites to Dr. Hayes's Medical Source Statement; however, Dr. Hayes opined only that Plaintiff had difficulty getting out of bed due to her depressive symptoms, R. 1029, and, as discussed *supra*, the ALJ accorded his opinion little weight. Moreover, the records often indicate that Plaintiff was explicitly not

33

suffering from malaise. R. 598, 726, 736, 798, 803.  Finally, although Plaintiff testified that she

sleeps a lot throughout the day, she attributed this to her medications and not to Sjogren's

syndrome.

Accordingly, I find that the ALJ's determination at step three as it relates to listing 14.10

was similarly supported by substantial evidence.

### 2.   Substantial Evidence Supports the ALJ's RFC Determination

Plaintiff argues that the ALJ's RFC determination was made in error because (1) the

ALJ's finding that Plaintiff can occasionally climb ramps and stairs is not supported by

substantial evidence; (2) the ALJ's opinion is internally inconsistent; and (3) the ALJ failed to

comply with 20 C.F.R. 404.1529 in evaluating Plaintiff's subjective complaints concerning her

symptoms.

As outlined above, the ALJ ultimately found that Plaintiff had the RFC "to perform

sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except: The claimant may

only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. The claimant

may never climb ladders, ropes or scaffolds, and stooping is limited to approximately 90 degrees.

The claimant may only frequently reach[,] handle, finger, or feel.  The claimant may frequently

operate foot controls.  The claimant should avoid concentrated exposure to extremes of heat,

cold, humidity, vibration, odors, dusts, gases, fumes[,] etc.  The claimant should avoid exposure

to hazards.  The claimant retains the mental residual functional capacity to perform unskilled

work where interactions with others are limited to only occasional, and which would allow her a

regular work break approximately every two hours." R. 34-35 (emphasis omitted).

### a.   Only Occasionally Climb Ramps and Stairs

Plaintiff first argues that no evidence in the record supports the ALJ's finding that

Plaintiff can occasionally climb ramps or stairs. Dkt. 12 at 27.  This contention is demonstrably false as Dr. Leber opined that Plaintiff could *frequently* climb ramps and stairs. R. 1019. Second, Plaintiff relies on the opinions of Dr. Hussain and Dr. Aseme, discussed *supra*, the MRI of her lumbar spine showing a disc bulge at L4/5 and L5/S1, and Dr. Kepecs's observation that Plaintiff experienced pain, numbness, and stiffness in her left leg. Dkt. 12 at 17.  As discussed, the ALJ provided good reasons for according the opinion of Dr. Hussain little weight, and the weight accorded the opinion of Dr. Aseme—identical to that of Dr. Hussain—was not contested by Plaintiff.  After a review of Plaintiff's testimony and the record evidence, the ALJ found "little to corroborate the severity she and some of her physician [sic] allege" concerning "postural activities, including climbing." R. 40.  The ALJ further explained that "[t]he evidence generally shows no more than moderate back and joint pain, with little to justify a total ban on the performance of postural activities." *Id.*  For the reasons discussed above, these conclusions were supported by substantial evidence.  Moreover, the ALJ's determination is further supported by the lumbar MRI findings, also discussed above, revealing no more than mild findings. R. 44. Finally, Dr. Kepecs's observation that Plaintiff experienced pain, numbness, and stiffness in her left leg does not overcome the substantial evidence in the record supporting the ALJ's conclusion that Plaintiff could only occasionally climb ramps and stairs.

### b.  The ALJ's Opinion is Not Internally Inconsistent

Plaintiff essentially argues that the ALJ cherry-picked from the opinions of Drs. Leber, Hussain, and Aseme, all of whom the ALJ accorded partial or limited weight, in reaching his RFC determinations that Plaintiff can occasionally balance, stoop, kneel, crouch, or crawl; frequently operate foot controls; and "should avoid concentrated exposure to extremes of heat, cold, humidity, vibration, odors, dust, gases, fumes[,] etc." Dkt. 12 at 28-29.  Defendant

contends that, "[c]onsistent with [the ALJ's] role as the factfinder, the ALJ considered the conflicting evidence, adopted portions of the doctors' opinions that he deemed supported by substantial evidence, discredited those portions that he deemed unsupported, and formulated an RFC based on his assessment of the evidence as a whole" in accordance with *Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016). Dkt. 22 at 37-38.  I agree.  As discussed *supra*, the ALJ provided good reasons to accord Dr. Hussain's opinion little weight, and the weights accorded the opinions of Dr. Aseme and Dr. Leber are not contested by Plaintiff.  Plaintiff's "disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents [the Court] from reweighing it." *Krull*, 669 F. App'x at 32.

### c.  Evaluating Plaintiff's Subjective Complaints

Plaintiff next argues that the ALJ committed reversible error by failing to consider Plaintiff's "testimony regarding precipitating and aggravating factors; side effects of Plaintiff's medications; the location, duration, frequency, and intensity of pain and other symptoms; and measures taken by Plaintiff to relieve pain and other symptoms" in violation of 20 C.F.R. 404.1529. Dkt. 12 at 29.

Plaintiff first argues that the ALJ failed to consider Plaintiff's testimony that several actions can aggravate her physical impairments.  Specifically, Plaintiff complains that the ALJ ignored that writing caused pain to her upper extremities; holding her hands up caused pain to her shoulders, arm, and neck; sitting for prolonged periods induced a tingling sensation; bending down to touch her toes aggravated her back pain; extending and reaching with her arms caused stiffness and pain; sweeping caused pain in her arms; combing someone's hair caused pain in her arms; buttoning her clothes caused numbness in her fingers; and sitting down and standing up too fast caused her to experience shortness of breath. Dkt. 12 at 29-30.

Contrary to Plaintiff's assertions, the ALJ specifically addressed Plaintiff's testimony that bending at the waist caused her pain, including adding the limitation in her RFC of stooping—which the ALJ explained to the VE included bending at the waist—to 90 degrees because Plaintiff specifically testified she could only bend over 90 degrees. R. 34 & n.2; *see also* R. 78, 97. The ALJ also specifically considered Plaintiff's testimony that her "arms only stiffen when extended and that she experiences some numbness in her fingers and thumbs after use." R. 40. Additionally, the ALJ specifically referred to Plaintiff's testimony that rising from a seated position caused her to experience shortness of breath and noted that the records revealed that Plaintiff's cardiac functions were generally normal due to the fact that at the hearing Plaintiff blamed the shortness of breath on her heart condition. R. 39-40; *see also* R. 95. Although the ALJ did not explicitly quote all of Plaintiff's testimony regarding the aggravations caused by writing, holding her hands up, sweeping, combing, and sitting for prolonged periods, the ALJ addressed all of the alleged symptoms, including pain in her upper extremities and the repeated findings in the record that Plaintiff had full range of motion and strength in her upper extremities (R. 36, 37, 38, 41, 42); pain in her shoulders, arms, and neck (R. 37, 38, 40, 42); and her ability to sit for prolonged periods of time (R. 38, 39, 41, 43). Moreover, the ALJ referenced the MRIs of Plaintiff's cervical, lumbar, and thoracic spine, and the EMG of her left elbow, all with unremarkable, mild, and moderate findings. R. 38.

As to Plaintiff's mental health concerns, Plaintiff argues that "[t]he ALJ failed to consider that certain noises, such as loud sirens, could trigger her vertigo." Dkt. 12 at 31. Though not included in his written decision, the ALJ explained to the VE at the hearing, after giving the limitation that claimant should avoid exposure to hazards, that "[c]laimant should not work in environments which expose her to sounds of jackhammers and other very loud noises on a

regular basis," which the VE considered in reaching his conclusions. R. 97-98.  Moreover, the ALJ thoroughly discussed Plaintiff's vertigo diagnosis, including evidence showing that her vertigo had stabilized and that she had never fallen or lost balance due to loud noises. R. 35, 36, 40.

Plaintiff next argues that the ALJ failed to consider the side effects of her medications, including nausea, drowsiness, stomachache, and dry mouth. Dkt. 12 at 30.  The Court first notes that the ALJ recognized Plaintiff's complaints of nausea, dizziness, vertigo, and dry mouth, as well as records demonstrating that medications had improved Plaintiff's vertigo and dizziness. R. 36, 37, 40.  As Defendant argues, the records do not appear to support Plaintiff's testimony regarding the side effects of her medications. The Court finds no instances in the record of Plaintiff complaining of nausea, drowsiness, or dry mouth—indeed, Plaintiff specifically blames her dry mouth on Sjogren's syndrome—being caused by medications and notes, as does Defendant, that the physicians in the record did not attribute any of their findings to the side effects of Plaintiff's medications.

As to Plaintiff's mental health, Plaintiff similarly contends that the hearing decision failed to mention the side effect of her medication, such as drowsiness. Dkt. 12 at 31.  Again, Plaintiff points to no instances, and the Court finds none, in which her mental health providers based their limitations on the side effects of Plaintiff's medications or in which the records support her testimony.

Plaintiff also argues that the ALJ failed to consider the intensity of Plaintiff's lower back pain and that the intensity of her physical pain had negatively affected her ability to interact with others. Dkt. 12 at 30.  The ALJ addressed plaintiff's back pain and her ability to get along with others throughout his RFC analysis. *See* R. 36, 37, 38, 39, 40, 43, 44.  Addressing her complaints

of back pain, the ALJ noted that "her lumbar spine MRI showed no more than mild findings." R. 44; *see also* R. 38.  As discussed *supra*, substantial evidence in the record supports the ALJ's conclusion that Plaintiff had moderate limitations in the area of interacting with others, including the ALJ's observations that Plaintiff was often found cooperative and calm by medical staff and that she was engaged and helpful in group therapy.  Notwithstanding Plaintiff's complaints of severe pain related to limitations, which substantial evidence supports were moderate at most, the ALJ's failure to explicitly cite this aspect of Plaintiff's testimony does not overcome the substantial evidence in support of the ALJ's RFC determinations.

As to Plaintiff's mental symptoms, Plaintiff argues that the ALJ failed to consider her testimony that she experienced difficulty completing tasks and following instructions, that she slept frequently, that the decline in her mental health had affected her ability to care for her children, that the severity of her mental health negatively affected her ability to interact with others, that she testified that even if her physical conditions improved she would not be able to return to work due to her mental state alone, that she had trouble getting along with people at her former job, and that her attorney asserted at the hearing that Plaintiff had trouble interacting with people at her attorney's office. Dkt. 12 at 31-32.  Similar to the discussion above, the ALJ's conclusions that Plaintiff suffered from mild to moderate limitations in all four of the paragraph B criteria related to Plaintiff's diagnoses of depressive and impulse-control disorders and Sjogren's syndrome were supported by substantial evidence.  As outlined *supra*, the ALJ considered the record evidence regarding Plaintiff's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; adapt or manage herself; and limitations related to her activities of daily living.  Moreover, the ALJ specifically addressed Plaintiff's sleep issues related to her mental impairments, as well as her anger and isolating

behaviors, but also noted that medical notes generally showed that her conditions were stable. R. 37; see also R. 39, 40, 42-43.

Additionally, Plaintiff contends that the ALJ failed to consider her testimony "that she would sleep a lot, including taking sleeping medication to avoid anxiety, meditate, "try to just massage, rub, different Icy Hot," elevate her leg and arm, and use a neck pillow to relieve her pain and other symptoms. Dkt. 12 at 31, 33. "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the Court] to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). Here, the ALJ's consideration, discussed *supra*, of Plaintiff's issues with sleep, her medications related to her anxiety diagnosis, findings of full strength in her upper and lower extremities, and moderate cervical MRI readings, undermines Plaintiff's assertion that the ALJ failed to consider this testimony in reaching his RFC conclusion.

Accordingly, I find that the ALJ properly considered Plaintiff's subjective complaints in his RFC analysis.

### d. The RFC is Supported by Substantial Evidence

Accordingly, based on the discussion above and after a review of the full record, I find that the ALJ's RFC assessment was supported by substantial evidence.

### C. Vocational Expert Testimony

Plaintiff objects to the way in which the VE calculated the number of jobs available in the national economy for the three jobs the VE determined Plaintiff could perform based on the ALJ's RFC hypothetical and, thus, that the VE's testimony was erroneous and inconsistent with the DOT. Dkt. 12 at 35. "Several district courts in this Circuit have held that if 'plaintiff's

counsel did not challenge the basis for the vocational expert's testimony . . . [any such] objections are forfeited' for review by the district court . . . . This is especially true where, as here, a plaintiff is represented by counsel during her administrative hearing." *Rodriguez v. Berryhill*, No. 18 Civ. 0918 (LGS)(HBP), 2019 WL 3741029, at *13-14 (S.D.N.Y. May 22, 2019), *report and recommendation adopted*, No. 18 Civ. 0918 (LGS)(HBP), 2019 WL 5158721 (S.D.N.Y. Oct. 15, 2019) (collecting cases). Here, the VE declared that his testimony was consistent with the DOT, and Plaintiff's counsel raised no objections to the VE's findings. R. 99-100. Accordingly, Plaintiff's objections are forfeited for review by this Court.

### D. Psychiatric Review Technique

Plaintiff contends that when addressing her mental impairments, the ALJ failed to perform the Psychiatric Review Technique ("PRT") described in 20 C.F.R. § 404.1520a. Dkt. 12 at 34. The PRT requires (1) that the ALJ "evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [she] ha[s] a medically determinable mental impairment(s); (2) "[i]f [the ALJ] determine[s] that [the claimant] ha[s] a medically determinable mental impairment(s), [the ALJ] must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [his] findings;" (3) the ALJ "must then rate the degree of functional limitation resulting from the impairment(s) . . . and record [his] findings;"[4] (4) "[a]fter [the ALJ] rate[s] the degree of functional limitation resulting from [the claimant's] impairment(s), [the ALJ] will determine the severity of [her] mental impairment(s);" (5) "[i]f her mental impairment(s) is severe, [the ALJ] will then determine if it meets or is

---

[4] There are "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 404.1520a(c)(3).

equivalent in severity to a listed mental disorder;" (6) "[i]f [the ALJ] find[s] that [the claimant] ha[s] a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, [the ALJ] will then assess [her] residual functional capacity;" and (7) "document application of the technique in the decision." 20 C.F.R. § 404.1520a(b)-(e).

Plaintiff does not specify in what manner the ALJ failed to apply this technique and, as discussed above, the ALJ followed these steps in his consideration of Plaintiff's mental impairments.  Accordingly, I find that the ALJ performed the PRT.

### E.  The ALJ's RFC Does Not Mandate a Finding of Disability

Lastly, Plaintiff argues that because "SSR 96-9p indicates that [three] breaks are usually only provided in an 8 hour day: a morning break, a lunch period, and an afternoon break," the ALJ's RFC determination that Plaintiff is limited to work "which would allow her a regular work break approximately every two hours," and which Plaintiff claims would total four breaks a day, requires a finding of disability. Dkt. 12 at 33.  SSR 96-9p advises that "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals.  If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded."

Notably, both SSR 96-9p and the ALJ's RFC limit breaks to approximately every two hours, which add up to the suggested three breaks a day.  Accordingly, the ALJ's RFC determination does not mandate a finding of disability.

## VI.   CONCLUSION

For the reasons set forth above, Plaintiff's motion for judgment on the pleadings is **DENIED**, and Defendant's motion for judgment on the pleadings is **GRANTED**.

The Clerk of the Court is respectfully requested to terminate the pending motions (Dkts. 11, 21) and close this case.


Dated:  August 28, 2020
        White Plains, New York


SO ORDERED

Paul E. Davison, U.S.M.J.